# PACIFIC WESTERN OIL CO. v. McDUFFIE et al.*

## No. 7349.

Circuit Court of Appeals, Ninth Circuit.

Feb. 13, 1934.

Dockweiler & Dockweiler, L. R. Van Burgh, Paul Barksdale D'Orr, Thomas A. Reynolds, Frank H. Love, and A. L. Abrahams, all of Los Angeles, Cal., for appellant.

Henry F. Prince, Homer D. Crotty, and Norman S. Sterry, all of Los Angeles, Cal. (Gibson, Dunn & Crutcher, of Los Angeles, Cal., of counsel), for appellee McDuffie, etc.

Leo S. Chandler, of Los Angeles, Cal. (Chandler, Wright & Ward, of Los Angeles, Cal., of counsel), for appellee Creditors' Protective Committee.

Robert B. Murphey, of Los Angeles, Cal. (Call & Murphey, of Los Angeles, Cal., of counsel), for appellees Bank Creditors.

Louis W. Myers, of Los Angeles, Cal. (O'Melveny, Tuller & Myers, of Los Angeles, Cal., of counsel), for appellee trustee.

Alexander Macdonald and Robert H. Edwards, Jr., both of Los Angeles, Cal. (Bauer, Macdonald, Schultheis & Pettit, of Los Angeles, Cal., of counsel), for appellee Richfield Bondholders' Protective Committee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

*Rehearing denied April 13, 1934.

GARRECHT, Circuit Judge.

The appellant brings this appeal from an order made by the District Court denying the appellant's petition that Wm. C. McDuffie, as receiver of Richfield Oil Company of California, a corporation, be required to pay as a cost of operation of the receivership the appellant's claim of $1,070,768.43 due for oil and casing-head gasoline, which it had delivered to the corporation prior to the receivership.

For purposes of brevity we shall designate Pacific Western Oil Company as "appellant," respondent Wm. C. McDuffie, receiver of Richfield Oil Company, as "receiver," and the respondent corporation, Richfield Oil Company of California, as "Richfield."

Appellant is a Delaware corporation, and was and is engaged in the production of oil and natural gas. Richfield, also a Delaware corporation, was principally engaged in the business of refining and distilling crude oil and in distributing and selling the derivatives thereof, up to January 15, 1931, when a receiver was appointed, and the receiver since has carried on the business.

Appellant's petition alleges, and the answers admit, that under date of November 14, 1928, Richfield and appellant entered into a contract, a copy of which is attached to the petition as Exhibit A, whereby appellant agreed to sell and deliver to Richfield, the buyer, for the full term of the contract, ending at midnight on June 19, 1938, all of the crude petroleum produced and saved from the wells then owned or operated by the seller, up to an aggregate of 20,000 barrels a day. The contract also gives to the buyer the right at its option to purchase any additional oil which the seller may produce. Further, the contract provides that the oil shall be delivered from the tankage of the seller, and that the buyer shall take such oil from such tankage into its pipe lines, as produced, within forty-eight hours after it is offered for delivery, and also that the title to the oil shall pass to the buyer as and when it is received into its pipe lines or other receptacles. The price which the buyer agrees to pay the seller is the prevailing current price, at the time of each delivery, as fixed by certain of the major oil companies. There are other provisions not material here. On the same day another contract, being attached to the petition as Exhibit B, was entered into between the same parties for the sale and purchase by Richfield of all the casing-head gasoline manufactured by appellant within the state of California. Some deliveries made under this contract were unpaid for when Richfield went into receivership, but, as this contract was terminated by the parties before the receivership, it has no bearing in the controversy. These contracts provided that Richfield should pay petitioner on the 15th day of each month for the oil and casing-head gasoline delivered during the preceding month.

In considering the relationship of the parties, it may be important to note that Mr. McDuffie was and is an oil operator of very wide experience. At the time of the execution of these contracts, he was president of the appellant, and remained such until February 9, 1932, at which time he became chairman of appellant's board of directors, continuing as such to March 16, 1933. He was very heavily interested financially in the appellant, and at the time of the hearing in the District Court still retained all of his financial interests. On the 29th day of December, 1930, at the instance and request of the directors of appellant and a number of large unsecured creditors of Richfield, he was elected president of Richfield. On the 15th day of January, 1931, he was appointed receiver of Richfield. Prior to and at the time of his appointment the court was fully advised of his connection with, and interest in, appellant. He also offered to resign as president of appellant, but at the earnest request of its directors did not press his resignation.

Thus Mr. McDuffie was prevailed upon to accept a position where some of his official acts were in conflict with his own personal interests. On account of his very large ownership in the stock of the petitioner, it would be to his personal advantage if appellant prevailed in its contention, but it should be said that the receiver, in disregard of his own personal interest, has opposed the claim of appellant throughout. Nevertheless, it is the contention of appellees that this conflicting relationship of itself would avoid any implied adoption of the contract as contended for by appellant, a result for which the receiver would in no wise be responsible.

Richfield also had contracts with a great number of other persons, firms, and corporations similar to the one with petitioner, which is involved in this suit.

At the time of the appointment of the receiver, and for a long time before, the posted field price for oil was in excess of what could be realized from the sale of the refined product, which resulted in an artificial market for crude oil. Richfield was purchasing under these contracts a very large percentage of the oil which it used in the manufacture of

the gasoline which it sold, and, as a result of purchasing oil at a price in excess of what it could realize from the refined product, Richfield was sustaining a daily loss due to market conditions.

For a considerable time prior to the receivership, Richfield had been failing to meet promptly the payments due appellant on the due date each month, for the oil and gasoline delivered the preceding month. These delinquencies had become so large as to cause discussion among the directors of appellant concerning the advisability of canceling the contract then still in force, and prior to the receivership Mr. McDuffie, as president of appellant, obtained an option from Richfield to cancel the contract at any time on thirty days' notice. Thereupon he endeavored, without success, to make sale of appellant's product elsewhere, but found no purchasers therefor. This situation was brought to the attention of all of the other directors of appellant, and it was the consensus of opinion that, in view of the fact that there was at the time no other outlet for its oil, it was best to continue with the delivery of the oil to Richfield and take chances on payment.

On January 15, 1931, when the receiver was appointed, Richfield was indebted to appellant in the sum of $1,070,768.43 for oil and casing-head gasoline delivered on its contracts prior to the receivership.

The receiver by the order of appointment was authorized "to the extent that the Receiver may determine that it is for the best interest of the receivership estate so to do, to perform and fulfill the contracts and obligations of the defendant," and the receiver was given power and authority to carry on Richfield's business fully and without restriction. The order contained this further provision: "The Receiver is hereby given a period of six (6) months from the date hereof within which to arrive at a determination as to what contracts including leases of the defendant the Receiver should affirm or disaffirm and within that time to make his election in that respect; the court reserves the right if so advised from time to time to extend or diminish the time so granted to the Receiver within which to make such election." This six-month period was extended by order of court duly made for a further period of two months, to and including the 15th day of September, 1931.

On February 11, 1931, the court made an order in the receivership proceedings, requiring creditors to file proof of their claims against Richfield with the receiver on or before April 1, 1931, and, on March 25, 1931, appellant, as required by said order, filed proof of claim based upon the aforesaid amount of $1,070,768.43, due for oil and casing-head gasoline delivered prior to the receivership.

The concluding paragraphs of said claim are as follows:

"That there are no offsets or counterclaims to said debt; no notes or other evidences of indebtedness have been taken or received; no judgment has been rendered for such indebtedness or any part thereof; and no claim for preference in payment from the receivership is made.

"The claimant holds no security for said indebtedness.

"Claimant hereby demands payment of the amount of its said claim, and also demands the performance by said receiver of the said agreement dated November 14, 1928, relating to crude petroleum oil, and of the said agreement dated November 14, 1928, relating to the sale of casinghead gasoline subject only to the modifications of the crude petroleum oil agreement hereinbefore referred to in this claim and attached hereto as exhibits. Claimant further refers to all obligations under said agreement, contingent or which will become due hereafter and, subject only to the aforesaid modifications, demands the allowance and payment of such claims by said receiver."

To meet the situation created by the condition of the oil market, as related to the contracts theretofore made with appellant and others above referred to, which has resulted in heavy losses to Richfield, the receiver immediately disaffirmed numerous contracts which Richfield then had for the purchase of oil at a bonus. As to contracts for the purchase of crude oil at market price, such as the one in suit, he required petitioner and the other sellers under such contracts to enter into a form of contract denominated a "crude oil agency contract," by the terms of which the receiver took the oil, refined it, and paid persons, firms, and corporations furnishing the oil a percentage of the receipts from the refined product; the price of the crude oil thus being determined by the selling price of the products.

Appellant made such a contract with the receiver, and it, as did all other crude oil agency contracts, provided that either party could, on thirty days' notice to the other, return to the payment terms provided by the original contract, without in any way affecting the right of the receiver thereafter to af-

firm or disaffirm such original purchase contract.

Concerning the making of this crude oil agency contract with the appellant, the receiver, Mr. McDuffie, testified (by affidavit): "In presenting the said crude oil agency contract to the directors, I outlined the plan and its advantages and the reasons why as Receiver I had adopted it, and I very distinctly stated to the directors that it was my duty as Receiver to see that every creditor and persons interested in Richfield was treated exactly alike, and I further stated that because I was President of Pacific Western and because of my very large financial interest in that company that I had to be, and intended to be, extra careful that Pacific Western received no advantage over any other creditor of Richfield or person interested therein, and that I intended to be extra careful that there was no preference or advantage given to Pacific Western; that for the oil and casinghead gasoline which Pacific Western had sold and delivered to Richfield prior to receivership Pacific Western would have to file a general claim the same as any other unsecured creditor; that so far as accepting any further oil under the contract Exhibit 'A' was concerned, I should have to at once disaffirm that contract unless Pacific Western was willing to modify the same by entering into the crude oil agency contract. I want to be specifically clear that I did not say to the Board that if they took the action I directed I would affirm the contract, nor did I say I would disaffirm it if they did not file a general claim. It had never entered my head, and it was not there discussed, that Pacific Western had any other than a general and unsecured claim for the oil and casinghead gasoline sold and delivered to Richfield prior to receivership and for which Pacific Western had not been paid. But I did state very clearly and emphatically as aforesaid that because of my interest in Pacific Western I intended to be very careful that Pacific Western had no advantage or priority over any other person, firm or corporation and that it would have to file a general claim for its oil and gas delivered prior to receivership and for which it had not been paid, the same as any other unsecured creditor. I did state that I would have to disaffirm the contract unless the company executed and agreed to the modification of the said contract by the adoption of the said crude oil agency contract: If there had been any claim or assertion by any one that Pacific Western had, or should claim, anything other than a general, unsecured claim for its oil and gas delivered prior to receivership for which it

had not been paid, I should have at once notified Pacific Western that if such claim was predicated upon my continuing to take oil under either Exhibit 'A' or the modification thereof by the crude oil agency contract, that I would at once disaffirm the contract and refuse to take any oil; and I feel certain that every other director at said meeting must have so understood. * * *"

This suit was tried on affidavits, and on this point the affidavits of all of the then directors of appellant were to the effect that they understood that, unless they conformed to these requests of the receiver, he would cancel the contract.

On April 29, 1931, the petitioner joined an unsecured creditors' protective committee and assigned its claim to that committee. In the assignment the appellant stated that it was an unsecured creditor. Thereafter, on the 25th day of November, 1931, appellant's claim came on for hearing before a special master. Although there was no defense to the said claim, the receiver, because of his connection with, and interest in, appellant, made no recommendation with reference thereto. The master allowed the claim in full as an unsecured claim. No exceptions were taken to the master's report, and on the 2d of September, 1932, the report of the master, on due notice to all parties in interest, on hearing before the court, was affirmed. No exceptions were taken to the order of the court.

No appeal was taken from the order of the court by appellant or by any other party in interest with reference to appellant's claim, nor had appellant made any attempt to have the order of the court changed, modified, or vacated with reference to its claim until the filing of this petition on June 29, 1933.

The receiver had until September 15, 1931, to affirm or disaffirm the contracts. The receiver took crude oil from the appellant under the new crude oil agency contract until October 31, 1931, which was after the time for allowance or disaffirmance of the contract. After November 1, 1931, settlements for deliveries of crude oil were made on the basis set forth in the contract, Exhibit A.

The receiver asserts that he never at any time had any intimation from appellant or any one connected therewith that appellant had or claimed any right to payment for the oil and casing-head gasoline delivered prior to the receivership, and which had not been paid for, except as a general unsecured creditor, until on or about the 16th day of May, 1933, when he was advised by telephone that a preferred claim was to be made. At this later

date stock control of the appellant and the directorate had been materially changed since 1931, and none of the directors in office in 1930 were directors of appellant at said date.

As late as April 12, 1932, at a directors' meeting of appellant, attended by the receiver, at which he presided as chairman of the board, the question was discussed as to whether the general and unsecured claim which had been assigned to the creditors' protective committee should be withdrawn from the committee or left with the committee for another year, and a resolution was adopted to leave it with the said committee. In addition, at that time he was advised both as an officer and director of the appellant, and as receiver of Richfield, that the said claim had been presented to the master, that proof thereon had been taken, and it had been allowed as a general and unsecured claim.

After the appointment of the receiver, and during the time the so-called crude oil agency contract was in effect, appellant delivered the oil in amounts and as required by the contract of November 14, 1928, Exhibit A, the receiver paying appellant therefor as provided in the said crude oil agency contract. After the termination of the crude oil agency contract, appellant continued deliveries under the contract Exhibit A, and the receiver paid for the oil so delivered as provided in said contract.

The appellant does not claim that there ever was any direct affirmance of the contract; the contention made being that the receipt of deliveries by the receiver, first under the substituted crude oil agency contract, which partially carried out the terms of the old contract, and later, after October 31, 1931, under all the terms of the old contract, constituted an implied adoption of this contract. The appellant then contends that, the receiver thus having adopted the contract, the indebtedness incurred under the contract prior to the receivership, as well as the indebtedness for crude oil received after the appointment of receiver, constitute a receivership cost and expense of administration.

Accordingly, the receivership is subjected to the antecedent burden of the $1,070,-768.43 debt for deliveries made to Richfield prior to the receivership, for which appellant had theretofore filed a general claim, and which had been allowed by the court as such. This argument is based upon the rule that a receiver adopts a contract cum onere. The receiver and Richfield contend that the correct interpretation of the rule means that in adopting a contract the receiver in effect makes a new contract between the other party and himself, and is hence necessarily burdened only with the obligations of the contract thereafter arising, so that, if the action of the receiver be here construed to be an implied adoption of the contract, its terms applied to the future only. Appellees also assert that appellant, by reason of having filed a general claim in the receivership proceeding, has secured its approval as such by the court, and, by other conduct, has estopped itself from claiming that it had other than a general unsecured claim for any and all of the oil and casing-head gasoline sold to Richfield prior to the receivership. It is also argued on behalf of the interveners that the receiver, occupying the position of a trustee for all creditors and other parties in interest, was prohibited by law from dealing with the receivership estate so as to make a personal profit and gain therefrom, which would result if it be determined that any implied adoption of the contract by the receiver had the effect claimed by appellant, and that thereupon under the law the adoption of the contract would be held void and ineffectual.

The receivership was not liable for the debts nor bound by the obligations of contracts when the receiver took possession of Richfield's property. The receiver, under the direction of the court, had the option to assume or renounce any contract.

The receiver, upon his appointment, found deliveries of oil being made under the contract here in question, and other similar contracts and still other bonus contracts. It was apparent that these contracts were the occasion of great loss to Richfield. The receiver immediately discontinued the bonus contracts. He proposed to the holders of all other contracts that a special crude oil agency contract be entered into, whereby Richfield was released from paying the market price as determined by the contracts, and in lieu thereof Richfield would refine the product delivered to it, and an ascertained percentage of what was received by Richfield therefor would be returned to the contract holders. The purpose of all the parties seems to have been to co-operate to their mutual advantage.

At the inception of the receivership, appellant could not have been compelled to continue to make deliveries, as the facts show Richfield was in default, and because of which an option had already been granted permitting appellant to cancel the contract, and appellant prior to the receivership had endeavored to find other purchasers for their product without success, and only continuing

to deliver to Richfield because there was no other outlet, and in the hope that the condition of Richfield would improve and payments be met. These facts were fully known to the receiver and to appellant.

■■ Equity looks at the substance and not at the form. All the parties understood and accepted the situation. Adoption may be signified either by express agreement or by implication. It is not contended that the receiver expressly adopted the contract. What, then, are the implications which inhere in the situation? The receiver immediately advised the directors of appellant that for the oil delivered prior to the receivership he would require appellant to file a general claim—upon no other condition would he continue dealing with appellant. It is uncontradicted that this was clearly understood by appellant's board of directors. It follows that all future relations were entered into upon the assumption that appellant would have only a general claim for deliveries made prior to the receivership, and the conduct of the respective parties clearly indicates the acceptance of these implications.

■ It is a general rule that a receiver does not affirm and adopt an existing contract merely by taking possession of the property to which it relates along with other property of the estate; likewise, he may, with the approval of the court, perform some part of the contract, experimentally, or pending his election to adopt or reject it, without being or thereby becoming bound by its terms. It is not the rule that the contract is binding on the receiver until renounced. In order for a receiver to become bound by a contract, he must positively indicate his intention to adopt it; the receiver is not bound until he has affirmed it and assumed its burdens under the direction of the court. On the facts of this case there can be no claim of affirmance by conduct or an estoppel against renunciation. Peabody Coal Co. v. Nixon (C. C. A.) 226 F. 20; Menke v. Willcox (D. C.) 275 F. 57; 53 C. J. 151. The appellant argues that, by the conduct of the receiver in accepting deliveries at market price and to the amount stipulated in the contract, the receivership thereby became bound to pay as an expense of administration for oil delivered before the inception of the receivership. We think this argument is unsound. The conduct of the receiver and of appellant itself compels a different conclusion. From the very beginning the receiver made it plain that he would cancel the contract unless appellant renounced any claim for preference for the

deliveries already made. It complied by filing a general claim, which was allowed as such by the court. The receiver had a right to cancel the contract if appellant had refused to conform to his request. In pursuance to this definite understanding, the action taken by appellant in filing its claim and taking part to that extent with all other unsecured creditors warranted the assumption by the receiver that the appellant thereafter had or made no claim to payment for the preexisting indebtedness other than as a general unsecured creditor.

If it was appellant's intention to shift its position, it was incumbent upon it in view of the understanding of all the parties to have notified the receiver. The appellant knew that the receiver was relying upon this understanding, and, under the circumstances, it was estopped to change its position without advising the receiver of its intention so to do.

The decisions of Eames v. H. B. Claflin Co. (D. C.) 220 F. 190; Atchison, T. & S. F. R. Co. v. Hurley (C. C. A.) 153 F. 503, and other cases cited by appellant which held that an election for continuation of a contract under the facts peculiar to those cases subjected the receivership to certain burdens under the contracts there in question, are not authority in this case where the facts are very different. Here there was a contract which, because of Richfield's default, appellant prior to the receivership had secured the written option to cancel and was in the position to abrogate at will, and where its president had been actively engaged in seeking other purchasers for its product. The receiver when appointed at once elected not to assume or adopt the contract, but affirmatively, and as a condition precedent to entering upon any business dealing with appellant, requested the abandonment of any claim or priority for existing indebtedness, while at the same time demanding a new contract. That the parties may have had in contemplation returning to the terms of the old contract when conditions warranted dealing on a market price basis would not have the effect of postponing the determination of making final the status of the old indebtedness as a mere general claim against the receivership, and when later the oil produced by appellant was received and payments made according to the terms of the old contract, this did not have the effect of reviving or burdening the receivership with the antecedent indebtedness to appellant. All parties who were in authority representing appellant Richfield and the re-

ceivership at the time agree that this was the understanding.

■ Had the receiver intended to create a situation which would result in appellant's general claim securing the preferred status of a receivership expense, the receiver would be without power to bring about such result without the approval and direction of the court. Here the receiver did not intend such result. The court at the instance of appellant had theretofore approved appellant's demand as a general claim, and refused to change its order or yield to appellant's contention.

It also affirmatively appears that the appellant suffered no injury by reason of the receiver abrogating and discontinuing the crude oil agency contract and accepting deliveries at the market price upon the terms as provided in the contract Exhibit A. Clearly the interest of all the parties was promoted by what was accomplished; and appellant was benefited and not injured, and there is no merit in the contention, and there is no evidence that there was any new burden or added obligation imposed upon appellant by continuing purchases under the contract at market price which would justify changing its relation to the receivership from a general creditor to a preferred status. No such purpose was contemplated, and there are no equities to justify such action. The doctrine on this subject was well stated by Brewer, J., in Olyphant et al. v. St. Louis Ore & Steel Co. et al. (C. C.) 28 F. 729, 731:

"The petitioner did not ask that this unsecured claim be awarded priority. The court did not direct that it should be given, and, as well suggested by counsel for the receiver, it would be a startling doctrine that the court appointing a receiver, and directing him to take possession of properties, must in that order, or by virtue of that act, wipe out all incomplete contracts and partially fulfilled agreements, at the risk of giving to the past-due general claims of parties holding these incompleted agreements a priority over secured liens. The court takes possession of the property for the benefit of all concerned, and should manage it with that purpose in view; making, even if it has the power, no other changes in the several relations of creditors to each other and to the common debtor than are absolutely necessary for the accomplishment of the main purpose. The interests of all parties oftentimes will be promoted by going on with contracts partially completed. The intervenor was so benefited in the case at bar. Whatever is done by the receiver, in the performance of these contracts, of course becomes an obligation upon the receivership and its property, to be protected by the court; but to hold that by virtue thereof the court goes back, and takes all obligations already matured which spring from the one contract, and casts them as a lien upon the property prior to that of the secured indebtedness we do not think ought to be tolerated."

In view of all the circumstances, to permit appellant to recover, as a charge against the receivership, for the products delivered to Richfield prior to the receivership, would be inequitable, and a manifest injustice to all other creditors. The principle involved in this case has already been determined by this court in the case of Republic Supply Co. of California v. Richfield Oil Company of California (Norwalk Co. v. McDuffie), 59 F.(2d) 35.

Our decision upon the main issue makes it unnecessary to consider other points urged upon appeal.

Affirmed.